IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ST. LOUIS MINIMARKET, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:20-cv-696 |

**COMPLAINT FOR DECLARATORY JUDGMENT**

NOW COMES the Plaintiff, Nautilus Insurance Company ("Nautilus"), by and through its attorneys, Josephine Abshier of Hesse Martone, P.C., and for its Complaint for Declaratory Judgment against Defendant St. Louis Minimarket, LLC ("St. Louis Minimarket"), it states as follows:

**THE PARTIES**

1. Plaintiff Nautilus is, and at all relevant times has been, a corporation organized under the laws of Arizona with its principal place of business in Scottsdale, Arizona. At all relevant times hereto, Nautilus was a surplus lines insurer whose policies may be sold in Missouri.

2. At all times relevant hereto, St. Louis Minimarket was a limited liability company organized under the laws of Missouri with its principal place of business in St. Louis, Missouri. At all times relevant hereto, the sole member of St. Louis Minimarket is Hisham Mutan ("Mutan"), a citizen of Missouri.

**JURISDICTION**

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) in that the citizenship of the parties is completely diverse and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Specifically, the fire loss at issue in this lawsuit

allegedly resulted in greater than $75,000 in damage, and the insurance policy at issue in this lawsuit provides greater than $75,000 in insurance coverage.

**VENUE**

4. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this litigation occurred in this judicial district. Specifically, the insured property that is the subject of this lawsuit is located at 5101 St. Louis Avenue, St. Louis, Missouri 63115 ("Premises").

**THE UNDERLYING FIRES**

5. The Premises consists of a first floor convenience store, a vacant second-floor apartment, and an unfinished basement.

6. Prior to the fires described herein, the Premises was operated by St. Louis Minimarket, specifically Mutan.

7. For some or all of the time that St. Louis Minimarket operated as a convenience store, it was protected by a combined fire and burglar alarm system that was installed and operated by ADT, LLC ("ADT").

8. On or about November 25, 2017, at approximately 11:21 P.M, the St. Louis Fire Department responded to a report of a fire at the Premises. (A true and correct copy of the November 25, 2017 St. Louis Fire Department Report is attached hereto as **Exhibit A.**)

9. The St. Louis Fire Department extinguished the November 25, 2017 fire, and the last unit cleared the scene at approximately 12:54 A.M. on November 26, 2017. (Ex. A.)

10. Following the November 25, 2017 fire, St. Louis Minimarket did not reopen, though electricity to the Premises was still functional.

11. Less than one month later, on or about December 18, 2017, at approximately 3:00 A.M., the St. Louis Fire Department responded to a second fire at the Premises. (A true and correct copy of the December 18, 2017 St. Louis Fire Department Report is attached hereto as **Exhibit B.)**

12. Fire investigators determined that the December 18, 2017 fire was "intentionally set" through the ignition of a flammable material on the interior of the locked Premises. (Ex. B.)

13. On information and belief, no suspects were determined and no criminal charges were brought with respect to the December 18, 2017 fire.

14. On information and belief, for both the November 25, 2017 fire and the December 18, 2017 fire, the St. Louis Fire Department responded to the trigger of the ADT security system's fire alarm, not to a burglar alarm.

15. The Premises sustained a complete loss in the December 18, 2017 fire, and it has not been rebuilt or reopened as a convenience store in the aftermath of the December 18, 2017 fire.

**THE INSURANCE CLAIM**

16. St. Louis Minimarket and/or Mutan initially retained public adjuster Paul Abrams of Edwin-Claude, Inc. to assist with the claim for damage to the Premises arising from the November 25, 2017 fire and, subsequently, the December 18, 2017 fire.

17. Nautilus retained Bob McCluskey of Vericlaim, Inc. to act as an independent adjuster for the purpose of further investigating the claim.

18. On or about January 26, 2018, counsel for Nautilus sent correspondence to Mutan, informing Mutan that counsel had been retained to assist with the investigation of the two fires and that Nautilus was exercising its right under the insurance policy to conduct an examination under oath ("EUO") of Mutan. (A true and correct copy of the January 26, 2018 correspondence is attached hereto as **Exhibit C.**)

19. The January 26, 2018 correspondence also requested the production of certain documents by St. Louis Minimarket in advance of the EUO. (Ex. C.)

20. On or about January 31, 2018, counsel for Nautilus sent correspondence to public adjuster Paul Abrams, again requesting an EUO of Mutan and also seeking clarification of certain positions taken by Abrams. (A true and correct copy of the January 31, 2018 letter is attached hereto as **Exhibit D.)**

21. At the request of public adjuster Paul Abrams, on or about February 14, 2018, counsel for Nautilus sent further correspondence to Mutan. (A true and correct copy of the February 14, 2018 letter is attached hereto as **Exhibit E.**)

22. The February 14, 2018 correspondence referred to the earlier January 26, 2018 correspondence, requested an EUO "in the next 30 days," and requested the production of documents at least seven days prior to the EUO. (Ex. E.)

23. Nautilus received no response to the February 14, 2018 correspondence.

24. After being informed that St. Louis Minimarket had retained the law firm of Bruntrager & Billings, P.C., on or about March 6, 2018, counsel for Nautilus transmitted a copy of the February 14, 2018 letter to attorney Dan Bruntrager via email. (A true and correct copy of the March 6, 2018 email is attached hereto as **Exhibit F.**)

25. The March 6, 2018 email further emphasized that Nautilus was attempting to schedule an EUO of Mutan, restated the request for documents initially sought in the January 26, 2018 letter, and asked for dates that would work for Mutan in March or early-April 2018. (Ex. F.)

26. After receiving no substantive response to the March 6, 2018 email, counsel for Nautilus transmitted an April 6, 2018 letter to counsel for St. Louis Minimarket. (A true and correct copy of the April 6, 2018 letter is attached hereto as **Exhibit G.)**

27. The April 6, 2018 letter noted that, "[i]n a good faith effort to fully investigate and adjust this claim, Nautilus has made several attempts to schedule an [EUO]" of Mutan and summarized the repeated attempts to schedule the EUO since January 26, 2018. (Ex. G.)

28. Noting that "[t]o date, we have not received any further correspondence from you," the April 6, 2018 letter again sought certain documents and requested an EUO date in May 2018. (Ex. G.)

29. After receiving no substantive response to the April 6, 2018 letter, counsel for Nautilus transmitted a June 15, 2018 letter to counsel for St. Louis Minimarket in which counsel indicated that "to date, notwithstanding periodic communication from you or Mr. Abrams, I have not received any substantive response to my numerous requests, nor have I been provided with any availability for Mr. Mutan to sit for an EUO." (A true and correct copy of the June 15, 2018 letter is attached hereto as **Exhibit H.**)

30. Following correspondence between counsel for Nautilus and counsel for St. Louis Minimarket, an EUO was ultimately scheduled for July 31, 2018.

31. Upon the arrival of counsel for Nautilus at the EUO, counsel was initially informed that the EUO would need to be cancelled due to the potential inability of Mutan to answer certain questions due to an ongoing criminal proceeding against Mutan and others.

32. However, counsel ultimately agreed to the following agreement that allowed the EUO to proceed (this agreement was put on record at the EUO by Mutan's counsel): (1) Nautilus would "ask questions today as [Nautilus] would normally do at an examination under oath. And if there are areas that we think we need to step in on because of the pending litigation and assert Fifth Amendment privileges, we would do that. And [Nautilus] would reserve the right in the future to come back and reexamine on those matters if it should become necessary for the insurance

company in terms of determining their claim one way or another. And so it is also my understanding that unless and until we refuse at that point to submit, that they would not use the statements that were made today or the refusals to answer today as a final determination regarding the claim itself"; and (2) Nautilus "reserves the rights to conduct a future [EUO] of Mr. Mutan….with the understanding that Nautilus is diligently examining this claim and with the understanding that we might have to come back for a future EUO, there's no unreasonable delay with the resolution of this claim…"

33. Notwithstanding the fact that Mutan's criminal trial was still proceeding (and, in fact, is still pending as of the filing of this lawsuit), Nautilus continued to investigate the claim in the months following Mutan's EUO by requesting additional information from the insured and third parties to confirm the nature and extent of the losses at the Premises, as well as to confirm the insured's compliance with certain conditions under the Nautilus Policy.

34. For example, on June 5, 2019, sought and obtained certain ADT alarm records from St. Louis Minimarket.

35. Among these alarm records were an ADT "Activity Alarm Report" that encompassed the dates from September 8, 2017 to December 8, 2017 (ten days *before* the second fire). (A true and correct copy of the Activity Alarm Report is attached hereto as **Exhibit I.**)

36. On or about June 5, 2019, counsel for Nautilus transmitted an email to counsel for St. Louis Minimarket stating the following:

> I have a quick follow-up question regarding the documents that you were kind enough to send over on the above-referenced matter. The attached Activity Alarm Report is for 9/8/17 through 12/8/17. I can clearly see that the alarm was triggered on November 26, 2017 (the first fire), but the second fire occurred on 12/18/17 – 10 days after the period addressed in this report. Can you please send me (and, if necessary, have your client obtain from ADT) a report that goes through 12/19/17. I note that your last email stated that Mr. Mutan "believe[s] that there was an issue with the alarms for the second fire and they may have been inactive,

> though not because he had not set them." I just wanted to take a look at what the records show for the time between fires, through the day after the fire, just so we could have a full picture. Thank you, Jonathan.
>
> (A true and correct copy of the June 5, 2019 email is attached hereto as **Exhibit J.**)

37. Following counsel's June 5, 2019 correspondence, no additional ADT records were ever provided to Nautilus by the insured or by anyone on the insured's behalf.

38. On or about August 22, 2019, counsel for Nautilus again reached out to counsel for St. Louis Minimarket and again requested, among other things, "an ADT Activity Alarm Report like the one attached [*see* Exhibit I], but that covers the period from 9/8/17 to 3/8/18." (A true and correct copy of the August 22, 2019 email is attached hereto as **Exhibit K.**)

39. Notwithstanding the fact that St. Louis Minimarket previously provided an ADT Activity Alarm Report showing alarm activity *before* December 18, 2018, counsel for St. Louis Minimarket indicated in an August 26, 2019 email that "ADT has told my client this is all they have left since the account has been closed for so long (since after the second fire, unsure of exact date.) They were unable to provide him with an activity summary." (A true and correct copy of the August 26, 2019 email is attached hereto as **Exhibit L.**)

40. On or about December 30, 2019, counsel for Nautilus transmitted a letter to counsel for St. Louis Minimarket stating, among other things:

> Respectfully, we lack clarity as to why ADT would have been able to provide an ADT Activity Alarm Report for the period from September 8, 2017 through December 8, 2017 but would be unable to provide a similar report *for a **more recent period** than the period it has already provided.* Accordingly, we are formally requesting either: (1) a copy of an ADT Activity Alarm Report (including all arming, disarming, and triggers of the fire and burglar alarms) for the period from September 8, 2017 to March 8, 2018; or (2) a letter from ADT (and on ADT letterhead) explaining that the account has been pulled, that such a report is unavailable, and why such a report is unavailable.
>
> (A true and correct copy of the December 30, 2019 letter is attached hereto as **Exhibit M.**)

41. As of the filing of this lawsuit, Nautilus has received no response to the December 30, 2019 letter, nor has it received any of the information it requested therein concerning the ADT alarm system at the Premises.

**THE NAUTILUS POLICY**

42. Nautilus issued a multi-peril commercial lines insurance policy to St. Louis Ave. Minimarket LLC under policy number NN759421 for the policy period of March 2, 2017 to March 2, 2018 ("Policy"). (A true and correct copy of the Policy is attached hereto as **Exhibit N.**)

43. The Policy provides, in pertinent part, the following with respect to the property coverage afforded therein:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

* * *

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this Section, **A.1.,** and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a.** **Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises * * *

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b.** **Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility insure, unless otherwise provided for under Personal Property Of Others.

* * *

(*See* Ex. N.)

44. The Policy provides, in pertinent part, the following with respect to the Policy's burglary and robbery protective safeguards requirement:

**BURGLARY AND ROBBERY PROTECTIVE SAFEGUARDS**

This endorsement modifies insurance provided under the following:

COMMERCIALPROPERTY COVERAGE PART

**SCHEDULE**

| **Premises No.** | **Building No.** | **Protective Safeguards Symbols Applicable** |
|---|---|---|
| 1 | 1 | BR1 |
| **Describe any "BR-4":** | | |
| *Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. | | |

**A.** The following is added to the **Commercial Property** Conditions:

**BURGLARY AND ROBBERY PROTECTIVE SAFEGUARDS**

**1.** As a condition of this insurance, you are required to maintain the protective devices and/or services listed in the Schedule above.

**2.** The protective safeguard(s) to which this endorsement applies are identified by the following symbols:

**a.** "BR-1" Automatic Burglary Alarm, protecting the entire building, that signals to:

**(1)** An outside central station; or

**(2)** A police station.

* * *

**B.** The following is added to the **Exclusions** section of the Causes Of Loss – Special Form:

**BURGLARY AND ROBBERY PROTECTIVE SAFEGUARDS**

We will not pay for loss or damage caused by or resulting from theft if, prior to the theft, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

(Ex. N.)

**COUNT I**

**NO COVERAGE IS OWED BECAUSE ST. LOUIS MINIMARKET HAS BREACHED ITS DUTY TO COOPERATE WITH THE INVESTIGATION OR SETTLEMENT OF THE CLAIM**

45. Nautilus adopts and realleges the allegations in paragraphs 1 through 44 of its Complaint for Declaratory Judgment as paragraph 45 of Count I of its Complaint for Declaratory Judgment as if fully set forth herein.

46. The "Loss Conditions" section of the Commercial Property Coverage Part includes the following conditions:

**E. Loss Conditions**

* * *

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

* * *

**(8)** Cooperate with us in the investigation or settlement of the claim.

*** * ***

(*See* Ex. N.)

47. Following the July 31, 2018 EUO of Mutan (which itself took more than six months to schedule due to the general unresponsiveness of St. Louis Minimarket), Nautilus requested and obtained certain ADT alarm records from St. Louis Minimarket on June 5, 2019.

48. However, the ADT "Activity Alarm Report" encompassed only the dates of September 8, 2017 to December 8, 2017 (ten days *before* the second fire). (Ex. I.)

49. On or about June 5, 2019, Nautilus transmitted an email to counsel for St. Louis Minimarket stating the following:

> I have a quick follow-up question regarding the documents that you were kind enough to send over on the above-referenced matter. The attached Activity Alarm Report is for 9/8/17 through 12/8/17. I can clearly see that the alarm was triggered on November 26, 2017 (the first fire), but the second fire occurred on 12/18/17 – 10 days after the period addressed in this report. Can you please send me (and, if necessary, have your client obtain from ADT) a report that goes through 12/19/17. I note that your last email stated that Mr. Mutan "believe[s] that there was an issue with the alarms for the second fire and they may have been inactive, though not because he had not sent them." I just wanted to take a look at what the records show for the time between fires, through the day after the fire, just so we could have a full picture. Thank you, Jonathan.

(Ex. J.)

50. Following the June 5, 2019 no additional ADT records were provided.

51. On or about August 22, 2019, Nautilus again reached out to counsel for St. Louis Minimarket and again requested, among other things, "an ADT Activity Alarm Report like the one attached [*see* Exhibit I], but that covers the period from 9/8/17 to 3/8/18." (Ex. K.)

52. Notwithstanding the fact that St. Louis Minimarket previously provided an ADT Activity Alarm Report showing alarm activity *before* December 18, 2018, counsel for St. Louis Minimarket indicated in an August 26, 2019 email that "ADT has told my client this is all they have left since the account has been closed for so long (since after the second fire, unsure of exact date.) They were unable to provide him with an activity summary." (Ex. L.)

53. On or about December 30, 2019, Nautilus transmitted a letter to counsel for St. Louis Minimarket stating, among other things:

> Respectfully, we lack clarity as to why ADT would have been able to provide an ADT Activity Alarm Report for the period from September 8, 2017 through December 8, 2017 but would be unable to provide a similar report *for a* ***more recent period*** *than the period it has already provided.* Accordingly, we are formally requesting either: (1) a copy of an ADT Activity Alarm Report (including all arming, disarming, and triggers of the fire and burglar alarms) for the period from September 8, 2017 to March 8, 2018;

or (2) a letter from ADT (and on ADT letterhead) explaining that the account has been pulled, that such a report is unavailable, and why such a report is unavailable.

(Ex. M.)

54. To date, St. Louis Minimarket has not provided the requested ADT documents to Nautilus, nor has it responded to the December 30, 2019 correspondence seeking, at a minimum, confirmation from ADT as to why the requested documents are no longer available. Furthermore, Nautilus is unable to obtain that information directly from ADT because Nautilus is not the owner of the subject account.

55. In all, notwithstanding St. Louis Minimarket's obligation to cooperate with Nautilus in the investigation or settlement of its claim, and despite Nautilus' ongoing efforts to further investigate the claim, St. Louis Minimarket has ignored Nautilus' reasonable requests for full documentation concerning its ADT alarm system on the date of the December 18, 2017 fire.

56. The requested information concerning the state of the ADT alarm system on the date of the December 18, 2017 fire is material to Nautilus' investigation of the claim. To be sure, Nautilus needs the requested information in order to determine whether St. Louis Minimarket complied with the Policy's Burglary and Robbery Protective Safeguards Endorsement, which required the Premises to be equipped with an automatic burglary alarm protecting the entire building and that signals to an outside central station or to a police station. (Ex. N.)

57. As the December 18, 2017 St. Louis Fire Department Report indicated, the December 18, 2017 fire was "intentionally set" through the ignition of a flammable material on the interior of the locked Premises. (Ex. B.)

58. A functional burglary alarm system in compliance with the Policy's Burglary and Robbery Protective Safeguards Endorsement would have been triggered by the presence of an

unlawful intruder who intentionally set the December 18, 2017 fire, thereby providing authorities with an earlier warning of the fire and an opportunity to save the Premises.

59. St. Louis Minimarket's refusal to provide the necessary documents concerning the ADT alarm system has prevented Nautilus from fully investigating the claim and from determining whether St. Louis Minimarket complied with the terms of the Policy.

60. Nautilus has no duty under the Policy to provide coverage for the December 18, 2017 fire because of St. Louis Minimarket's material breach of its duty to cooperate with Nautilus' investigation of the claim.

61. An actual controversy exists between Nautilus and St. Louis Minimarket, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Nautilus, respectfully prays that this Honorable Court:

a. Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy;

b. Find and declare that St. Louis Minimarket breached the Policy by failing to cooperate with Nautilus in the investigation of the claim;

c. Find and declare that Nautilus has no duty under the Policy to provide coverage for the December 18, 2017 fire at the Premises; and

d. Grant Nautilus such other and further relief that the Court deems proper under the facts and circumstances.

**COUNT II**

**IN THE ALTERNATIVE, JUDICIAL DETERMINATION AS TO WHOM INSURANCE PROCEEDS SHOULD BE PAID**

62. Nautilus adopts and realleges the allegations in paragraphs 1 through 61 of its Complaint for Declaratory Judgment as paragraph 62 of Count II of its Complaint for Declaratory Judgment as if fully set forth herein.

63. At all times relevant hereto, the sole member of St. Louis Minimarket was Mutan.

64. On the date of the December 18, 2017 fire – and up to the present – a criminal case entitled *The United States of America v. Hisham Mutan, et al*. has been pending before the United States District Court for the Eastern District of Missouri under case number 4:17-cr-00234-RLW-DDN-3 ("Criminal Matter").

65. The indictment in the Criminal Matter incorporates a forfeiture allegation providing that "upon conviction of an offense in violation of Title 18, United States Code, Section 2341, 2342, 2343, 2344, 2345, or 2346 or conspiracy to commit such offense, as set forth in Counts 1 and 3 through 13, the defendant(s) shall forfeit to the United States of America any property, constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation(s), and any vehicle involved in such violation(s)."

66. The indictment in the Criminal Matter also provides that "[i]f any of the property described above, as a result of any act or omission of the defendants: a. cannot be located upon the exercise of due diligence; b. has been transferred or sold to, or deposited with, a third party; c. has been placed beyond the jurisdiction of the court; d. has been substantially diminished in value; or e. has been commingled with other property which cannot be divided without difficulty, the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

67. As the indictment (as well as much of the docket) in the Criminal Matter has been redacted and/or restricted, it is unclear if the Premises has been subject to a freezing of assets.

68. Moreover, on information and belief, the Premises has or had unpaid property taxes for the years 2016, 2017, 2018, 2019, and/or 2020.

69. If it is adjudged that Nautilus owes insurance coverage for the December 18, 2017 fire – which Nautilus expressly denies – Nautilus requires a judicial determination as to whom such insurance proceeds must be paid in light of the foregoing.

70. An actual controversy exists between Nautilus and St. Louis Minimarket, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Nautilus, respectfully prays that this Honorable Court:

a. Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Policy; and

b. In the event that it is adjudged that Nautilus owes insurance coverage for the December 18, 2017 fire, determine and adjudicate to whom any insurance proceeds must be paid.

Dated: May 28, 2020

Respectfully submitted,

HESSE MARTONE, P.C.

By: *_/s/ Josephine Abshier______________*
Josephine P. Abshier, #56708
530 Maryville Centre Drive, Ste. 250
St. Louis, MO 63141
(314) 862-0300 – Telephone
(314) 862-7010 – Facsimile
josephineabshier@hessemartone.com

Dana A. Rice (to be admitted Pro Hac Vice)
Jason Taylor (to be admitted Pro Hac Vice)
Traub Lieberman Straus & Shrewsberry LLP
303 West Madison Street, Ste. 1200
Chicago, IL 60606
(312) 332-3900 – Telephone
drice@tlsslaw.com

ATTORNEYS FOR NAUTILUS INSURANCE COMPANY